**Dr. Anjali A. JOSHI, Plaintiff,**

v.

**FLORIDA STATE UNIVERSITY et al., Defendants.**

**No. 78–0844.**

United States District Court,
N. D. Florida,
Tallahassee Division.

Feb. 22, 1980.

Stephen Lindsey Gorman, Algia R. Cooper, Tallahassee, Fla., for plaintiff.

Gene T. Sellers, State Bd. of Ed., Tallahassee, Fla., Gerald B. Jaski, Florida State University, Tallahassee, Fla., for defendants.

## MEMORANDUM OF DECISION

HIGBY, District Judge.

Plaintiff, Anjali Joshi, brought this action against Florida State University (FSU); the FSU Health Center; Bernard Sliger, President of FSU; Dr. Homer Ooten, Director of Business Affairs; Dr. Robert Hunter, former Director of the FSU Health Center; and Dr. Phillip C. Rond, Director of the FSU Health Center; under 42 U.S.C. § 2000e *et seq.*, alleging that the Defendants discriminated against her in their employment practices because of her sex, religion, or national origin. Dr. Joshi is a female physician, born and educated in India. In February, 1974, she spoke with Dr. Robert Hunter, then director of the Health

Center, about employment as a university physician. Plaintiff did not make formal application at that time because two factors made her ineligible for employment: having small children, she was unable to take mandatory night and weekend call duty, and she did not have a license to practice in the United States. On August 22, 1974, Plaintiff obtained her Florida medical license.

Almost one year later, about the middle of August, 1975, she informed Dr. Hunter that she was now licensed and that her children were old enough to permit her to take call duty. Plaintiff was interviewed again by Dr. Hunter and was introduced to a number of the doctors then employed by the Health Center. On August 18, 1975, Dr. Hunter sent a memorandum to Dr. Homer Ooten, the administrator with primary fiscal responsibility for the Health Center, requesting authorization to hire six doctors. The doctors were recommended in the order in which each had made a firm commitment to accept an appointment at the Health Center, and Dr. Joshi's name was fifth on this list. Dr. Ooten approved the hiring of the first four doctors on the list submitted by Dr. Hunter, and Plaintiff was therefore not one of the doctors approved. The doctors hired were a black female, a black male, and two white males.

Between August, 1975, and January, 1976, Dr. Hunter made repeated inquiries to Dr. Ooten about hiring additional doctors, particularly Dr. Joshi, as she was next on the priority list. In response to a January 8, 1976, memorandum from Dr. Hunter recommending that Dr. Joshi be hired at the earliest possible date, Dr. Ooten, on January 19, 1976, wrote:

I am in sympathy with the current workload and the low number of physicians on board; however, I do not feel that the 'earliest postmark' is sufficient justification for hiring a physician. Although your August 21, 1975, letter to Dr. Joshi implied a commitment, I do not feel that one has been made.

It strikes me that I should have input from the fulltime medical staff that will be working with the new physician.

(Plaintiff's Exhibit 7).

The letter goes on to ask that a committee of physicians meet with Dr. Joshi and then make a written recommendation on her employment. The committee was appointed and met with the Plaintiff; the recommendation they made is ambiguous. The first paragraph states the conclusion that the Plaintiff "appeared well qualified for this position;" but the last paragraph, voicing the opinion of Dr. McHugh, Chairman, states his feeling that before hiring any staff physicians, the vacancies should be advertised in the Journal of the American Medical Association in order to determine the availability of physicians. (Plaintiff's Exhibit 9). Due to the equivocal response of the committee, Dr. Ooten met with the members to get a firsthand interpretation of their recommendation. Both Dr. Ooten and Dr. Go (who was a member of the committee) testified that the further response of the committee was that the Plaintiff was not sufficiently qualified in clinical experience, particularly gynecology, an area of special need for the Health Center.

Dr. Hunter had served as director of the Health Center since April, 1970. On February 11, 1975, he sent a letter to Stanley Marshall, President of FSU, asking to step down from the position of director effective August 31, 1975, or earlier. (Defendants' Exhibit 10). No action had been taken on this request, and on January 23, 1976, the same day that the physicians' committee made the report on Dr. Joshi referred to above, Dr. Hunter wrote to Dr. Ooten asking permission to relinquish the director's position effective January 31, 1976. (Defendants' Exhibit 4). This time, Dr. Hunter's request was honored, and Dr. Phillip Rond became acting director on or about February 1, 1976. Although Dr. Hunter wanted to resign as director of the Health Center, he had, from the beginning, asked to stay on as a staff physician (Defendants' Exhibit 10) and had understood that even to "step down" he would have to be screened for employment by a committee. (Defendants' Exhibit 11).

From March 11, 1976, through March 26, 1976, a Staff Physician position was posted as vacant in accordance with state personnel rules. Dr. Ooten informed the Plaintiff by letter that she was being considered for the vacancy. (Plaintiff's Exhibit 11). The physicians' committee met on March 17, 1976, and recommended Dr. Hunter for the position of Staff Physician. Dr. Joshi's application was tabled "until the results of an advertisement in the medical journals have produced, or failed to produce, further applications." (Plaintiff's Exhibit 13).

After the rehiring of Dr. Hunter, Acting Director Dr. Rond continued to seek applications for physicians for the Health Center. On April 2, 1976, Plaintiff filed charges of discrimination with the Equal Employment Opportunity Commission. In September of 1976, Acting Director Dr. Rond hired two new physicians, one a white male with 22 years experience in family practice medicine and the other an Indian male educated in India and certified in surgery by the Royal College of Physicians in Edinborough, Scotland.

Plaintiff in this case is clearly convinced that she has been wronged and has attributed the treatment she received to her status as a foreign-born woman. Based on the evidence presented at trial, this court can only infer that Plaintiff had the misfortune to be caught in the middle of a university political, administrative, and budgetary battle. The evidence shows that Dr. Hunter, who had been director of the Health Center for a considerable length of time, was at odds with Dr. Ooten, the administrator brought in to eliminate Health Center budgetary deficits which were growing larger every year. Dr. Hunter was concerned with delivery of health services, thought the Health Center was understaffed, wanted to hire more doctors immediately, and was well aware of the difficulty in hiring qualified physicians at the salaries the Health Center could offer. Dr. Ooten, on the other hand, had been given a specific administrative mandate: he was to "turn around" the Health Center and the athletic program and stop the drain these auxiliary services were putting on the budget. Dr. Ooten was apparently also being backed by some Health Center physicians who were dissatisfied with Dr. Hunter as director, particularly with his hiring procedures.

 The burden of proof applicable in a Title VII case was detailed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972). The plaintiff has the initial burden of establishing a prima facie case of discrimination by showing (1) that she belongs to a protected minority; (2) that she applied and was qualified for a job for which the employer was seeking applicants; (3) that she was rejected despite her qualifications; and (4) that the position remained open and the employer continued to seek applications from persons of complainant's qualifications. *McDonnell* at 802, 93 S.Ct. at 1824. Plaintiff here has made out at least the general requirements of a prima facie case, although some real question exists as to the sufficiency of her qualifications for the position.

 Once a prima facie case is shown, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for its actions. *McDonnell* at 802, 803, 93 S.Ct. at 1824. Here the Defendants have made a more than adequate showing that the decision not to hire Dr. Joshi was based on legitimate reasons that had nothing to do with either her national origin or her sex. In 1975, the University was implementing an austerity program, had put a freeze on hiring, and had targeted the Health Center as a special budgetary problem. The first hirings by the Health Center were made on a priority of commitment basis and included members of protected classes. Dr. Joshi's continuing application then apparently became the focal point of a struggle between Dr. Ooten and Dr. Hunter; the issues being the number of doctors the Center would be allowed, the qualifications of those hired, and the amount of input by other staff physicians in hiring procedures. The committee of physicians who interviewed Dr. Joshi had reservations

about her qualifications and wanted a larger applicant pool from which to choose. (Dr. Go, a female Filipino doctor on the committee, testified specifically that she had some questions about Plaintiff's qualifications.) Finally, when a position opened up, Plaintiff found herself in competition with Dr. Hunter, the former director of the Health Center, who was stepping down to the position of staff physician. Dr. Hunter was obviously better qualified than Dr. Joshi and was hired. The committee which recommended Dr. Hunter also recommended that Plaintiff's application be "tabled" and that further advertisement for doctors take place before any more hiring was done. (Plaintiff's Exhibit 13).

In July, 1976, Plaintiff advertised in the Tallahassee Democrat that she was associating in the practice of family medicine with a doctor in a neighboring county. Although her application remained on file at the Health Center, Plaintiff did not renew that application. In September, 1976, two more physicians were hired upon recommendation of the physicians' committee: a white male and an Indian male. Based on the above subsidiary facts, Defendants have met their burden of showing legitimate reasons for not hiring the Plaintiff.

 If the employer meets the burden of showing legitimate non-discriminatory reasons for its actions, the plaintiff then must show that the articulated reasons were pretextual. *McDonnell* at 804, 93 S.Ct. at 1825. Plaintiff has failed to show that the Defendants' actions were a pretext for discrimination. She points to the fact that she was interviewed, more than once, by a physicians' committee, after having been approved for employment by Dr. Hunter. The Defendants presented evidence to show that formation of the committee was due to the desire of staff physicians to have more input in the hiring process and to the need for screening committees under affirmative action mandates. Plaintiff also points to Dr. Hunter's testimony that he had never before recommended hiring a physician and had that recommendation rejected. The Defendants

presented credible evidence to show that budgetary constraints were beginning to be felt at the University at just about the time that Plaintiff was being considered for employment, that the struggle between Dr. Hunter and Dr. Ooten for control of the Health Center had recently come to the fore, and that Dr. Hunter's complete control over hiring was unacceptable to some members of the Health Center staff. As her most telling example of pretext by the Defendants, Plaintiff offered the testimony of Dr. Yolande Mason that Dr. Rond (Director of the Health Center following Dr. Hunter's resignation) had told her in April, 1976, not to inform the Plaintiff of the resignation of one of the Center doctors. The court accepts Dr. Mason's testimony as true, but given the complete history of Dr. Joshi's involvement with the Health Center, finds that Dr. Rond's unwillingness to inform Dr. Joshi of a potential opening is not sufficient to convert the Defendants' reasons for not hiring Plaintiff into a pretext for discrimination. Dr. Rond's comment to Dr. Mason (which he does not remember making) came after the physicians' committee had recommended "tabling" the Plaintiff's application (Plaintiff's Exhibit 13, letter of March 17, 1976).

The Defendants' best evidence to counter allegations of pretext consists of the Health Center track record in hiring of minorities and women. The unrefuted statistical evidence presented at trial showed that during the entire period under consideration in this suit, the Health Center employed greater proportions of minority and female doctors than were available in the labor market. The Health Center, which maintains a staff of approximately 10 doctors, has employed a Filipino woman, a black woman, a white woman, an Indian male, and a black male as staff physicians.

In summary, Plaintiff's complaint of employment discrimination can be broken down into three separate situations. In August, 1975, Plaintiff was not hired because of budgetary problems: four physicians were authorized to be hired, and Plaintiff's name was number five on the list of those

recommended. From August, 1975, until January, 1976, Dr. Hunter continued to press for the employment of the Plaintiff, with Dr. Ooten continuing to refuse authorization. During this time, Dr. Joshi was not hired due to continuing budget problems and because of the power struggle between Doctors Hunter and Ooten described previously.[1] The third instance of contact between Dr. Joshi and the Health Center occurred in March, 1976, when Dr. Hunter had resigned as director and was being interviewed, along with the Plaintiff, for a staff physician position. Although the proceedings in this third instance were probably pretextual, in that Dr. Hunter was probably assured of receiving the job before any interviewing occurred, the procedure was not a pretext for invidious discrimination but for retaining a valued longtime employee. Following Dr. Hunter's hiring as a staff physician, the Plaintiff was in a different position: the physicians' committee had recommended that her application be "tabled," she had advertised her employment in a neighboring county, and the Health Center had a new director. The evidence shows that the next hiring of new doctors did not take place until September of 1976, when the Plaintiff was no longer actively in the running for employment at the Health Center.

In a Title VII case, the ultimate burden of persuasion by a preponderance of the evidence rests on the Plaintiff. *Jepsen v. Florida Board of Regents*, 610 F.2d 1379 (5th Cir. 1980), citing *Causey v. Ford Motor Co.*, 516 F.2d 416, 420 n. 6 (5th Cir. 1975). The employer complained of is not required to prove the *absence* of discriminatory motive, only that a legitimate non-discriminatory reason accounted for its action. *Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). The Supreme Court has recognized that "[c]ourts are generally less competent than employers to restructure business practices," *Furnco Construction Corp. v. Waters*, 438 U.S.

---

1. No other doctors were hired during this period, and it is questionable whether, for purposes of this second situation, Plaintiff has met the

567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978), and this principle applies even when a foreign-born woman becomes entangled in the workings of a large university. This unlucky circumstance does not constitute employment discrimination under Title VII.

Accordingly, it is ORDERED:

This action is dismissed with prejudice as to all Defendants, with costs to be borne by the Plaintiff.

fourth requirement of the *McDonnell* prima facie test: that the position in question remain open. *McDonnell* at 802, 93 S.Ct. at 1824.