Dr. Anjali A. JOSHI, Plaintiff-Appellant,

v.

FLORIDA STATE UNIVERSITY et al.,
Defendants-Appellees.

No. 80–5200.

United States Court of Appeals,
Fifth Circuit.
Unit B

June 1, 1981.
Rehearing and Rehearing En Banc
Denied July 23, 1981.

Stephen Lindsey Gorman, Algia R. Cooper, Tallahassee, Fla., for plaintiff-appellant.

Gene T. Sellers, State Bd. of Ed., Gerald B. Jaski, Tallahassee, Fla., for defendants-appellees.

Before TUTTLE, RONEY and VANCE, Circuit Judges.

TUTTLE, Circuit Judge:

Appellant, Dr. Anjali A. Joshi, appeals from dismissal of her employment discrimination suit under Title VII [1] in which she alleged that defendants [2] had discriminated against her on the basis of her sex, religion and national origin when they failed to offer her a position as staff physician at the Florida State University Health Center.

I. *Facts*

Appellant is a female physician, born and educated in India. In February 1974, she spoke with Dr. Robert Hunter, then director of the Florida State University Health Center, about employment as a staff physician. Dr. Hunter questioned her regarding her qualifications and gave her information about the operation of the Health Center. He then showed her around the Center and introduced her to several of the physicians employed there.[3] Dr. Joshi did not make a formal application at that time for two reasons: She did not have as yet a license to practice medicine in the United States, and she felt that caring for her two small children would preclude her from taking the required call duty. Dr. Hunter told her she should stay in touch with them.

In August, 1974, Dr. Joshi obtained her Florida medical license and so notified Dr. Hunter. However, Dr. Joshi did not make a formal application for a position as staff physician until August of 1975 when she finally felt she would be able to accept call duty.

During the middle of that month, she was interviewed by Dr. Hunter. According to his usual procedure, he conducted her through the medical center and introduced her to several physicians with whom she had brief interviews.[4] Following the tour, Hunter polled the physicians who had met Dr. Joshi. None had any objections to her personality or attitude. To this input from the staff physicians who would be working

---

1. 42 U.S.C. § 2000e *et seq.*

2. Defendants named in the Complaint were: Florida State University (FSU); Bernard Sliger, in his capacity as President of FSU; Dr. Homer Ooten, in his capacity as Director of Business Affairs; Dr. Robert Hunter, in his capacity as former Director of FSU Health Center; Dr. Philip Rond, as Director of the FSU Health Center.

3. Plaintiff testified that she met several physicians working at the Health Center. Dr. Hunter's notes from the interview, which were admitted into evidence, indicate that she saw Drs. Go and Gagliano.

4. The physicians who met with an applicant during the tour through the hospital were apparently selected at random, depending upon who was available at the time.

with Dr. Joshi, Dr. Hunter added his own evaluation of her written application.[5]

Dr. Hunter found Dr. Joshi to be fully qualified for employment as a staff physician, but he needed written authorization from Dr. Homer Ooten, the university administrator with primary fiscal responsibility for the Health Center, before he could fill any position at the Center. On August 18, 1975, he submitted her name, along with the names of five other applicants he had found to be qualified, in a memorandum to Dr. Ooten requesting authorization to hire the six doctors. Dr. Hunter recommended the doctors in the order in which each had made a firm commitment to accept the appointment.[6] Dr. Ooten approved the hiring of the first four on the list. As Dr. Joshi's name was fifth on the list, she was not hired.

On August 21, 1975, Dr. Hunter wrote Dr. Joshi to inform her that he had not received approval to hire her.[7] He stated that she was "next on the list and [would] have the first opportunity for the next position that opens." On January 8, 1976, Dr. Hunter sent a memorandum to Dr. Ooten in which he requested authorization to hire Dr. Joshi "at the earliest possible date" since the medical center was understaffed and Dr. Joshi was next in line for employ-

ment in terms of qualifications and priority.[8]

Dr. Ooten replied by memorandum dated January 19, 1976. He stated that he was concerned about the small number of physicians on the staff but that he felt that the fact that Dr. Joshi was next in line in terms of the date on which she had made a firm commitment to accept employment was insufficient justification for hiring her.[9] He stated that he did not feel that a commitment had been made to Dr. Joshi despite the implications of Dr. Hunter's letter to her on August 21, 1975. He requested Dr. Hunter to arrange for a select group of staff physicians to interview Dr. Joshi and forward their comments regarding her to him by way of a written recommendation.[10]

On January 22, 1976, Dr. Joshi met with this committee. The next day, Dr. McHugh, who had chaired the committee, submitted a written report of the interview to Dr. Ooten. He stated therein that the committee had questioned Dr. Joshi about her past medical experience and reached the conclusion that she appeared well qualified for the position. However, he concluded with the statement that he felt the vacancies should be advertised to determine the availability of physicians prior to hiring

5. There is no evidence that Dr. Hunter received written recommendations from the physicians who met with Dr. Joshi. She sent a letter dated June 13, 1975, with which she enclosed copies of her medical certificates, her Florida license and references. Dr. Hunter testified that he considered this letter to be her formal application for employment. Outside of his notes on the interview, Dr. Hunter apparently never prepared a written evaluation of the applicant.

6. The physicians listed in order of priority were: Drs. Donald Treger (white, male); Spurgeon McWilliams (black, male); Yolande Mason (black, female); Eugene Tubbs (white, male); Joshi; and Thomas Dale (white, male). Dr. Hunter testified that Dr. Dale had actually withdrawn his application before this memo was sent to Dr. Ooten.

7. Dr. Hunter did not indicate to Dr. Joshi why approval had been given only for four physicians, but he said simply that those four had priority based on having made commitments to come to work sooner than she had.

8. Dr. Hunter understood that funds were available for the hiring of a new physician. In a memo to Dr. Ooten dated January 8, 1976, he stated: "At present we have 10 FTE physicians out of an authorized 15. The minimum with which we could do a responsible job is 12. Our budget for the current fiscal year is based on 12 FTE physicians."

9. Oddly, Ooten had not objected to the "earliest postmark" method of differentiating among the applicants recommended as qualified by Dr. Hunter on August 18 when he said he felt constrained by budgetary reasons to limit his authorization to four of the six applicants listed.

10. The committee members designated by Ooten were Drs. Gagliano, Go, McHugh, Steele and Treger. Dr. Hunter added Dr. Mason to the list and requested Dr. McHugh to chair the committee.

any staff physicians. Ooten testified that he called a meeting of the committee members on February 20, 1976, in order to clarify the meaning of this report since it contained no clear recommendation either to hire or not to hire Dr. Joshi. He testified that he learned that some of the physicians had reservations about Dr. Joshi's qualifications.[11] Meanwhile, however, many things were happening at the Health Center.

Dr. Hunter had served as director of the Health Center since April, 1970. On February 11, 1975, he had sent a letter to Stanley Marshall, then President of Florida State University, in which he requested permission to step down from the position of director effective August 31, 1975, or earlier. No action had been taken on the request, and on January 23, 1976, the same day that the physician's committee made the report on Dr. Joshi referred to above, Dr. Hunter wrote to Dr. Ooten asking permission to relinquish the director's position effective January 31, 1976. This time Dr. Hunter's request was honored, and Dr. Philip Rond became acting director on or about February 1, 1976. Dr. Hunter testified that he assumed the position of staff physician, apparently the position to which Dr. Joshi aspired, on January 31, 1976.[12]

In early February, 1976, Dr. Joshi telephoned Dr. Hunter to find out what had been the result of her interview. Dr. Hunter told her that he was no longer the director and that she should contact Dr. Ooten. Dr. Joshi testified that she tried to reach Dr. Ooten but that he failed to return her call. Still anxious to learn the results of her interview, she telephoned Dr. Yolande Mason, a black female physician who had been present at the interview, who told Dr. Joshi that she would see what she could find out.[13] Dr. Joshi then telephoned Dr. Ooten's supervisor, Dr. Stephen McClelland, who told her that he would look into the matter. Dr. Joshi testified that shortly thereafter, Dr. Ooten called her and told her there was no vacancy. Dr. Joshi testified that she then phoned Jim Vickery in the Vice Chancellor's office of the Board of Regents who told her he would see what the problem was. Dr. Joshi also contacted Dr. Freddie Groomes, an assistant to the president of FSU with primary responsibility for developing the University's affirmative action programs.[14]

On February 26, 1976, Dr. Eugene Tubbs, a staff physician at the Health Center, resigned, creating a vacancy. On February 27, Dr. Ooten phoned Dr. Joshi and told her there was a vacancy for which they were going to advertise in the professional journals. That same day, Dr. Ooten wrote Dr. Joshi a letter to inform her that she was being considered for the position of staff physician.[15] From March 11, 1976, through

---

11. Specifically, Dr. Go testified that she was concerned that Dr. Joshi might not have the expertise in gynecology which was the area in which the Health Center was especially short-handed.

12. Dr. Ooten did not dispute the fact that Dr. Hunter began to serve as a university physician at the end of January, but he was careful to specify that Dr. Hunter was merely in an "acting capacity" as staff physician until the middle of March.

13. Dr. Mason was unsuccessful in reaching Dr. Ooten on February 6, when she called to find out what was the status of Dr. Joshi's application. On February 9, 1976, she received a memo from Dr. Ooten in which he strongly rebuked her for attempting to find out why Dr. Ooten had not returned Dr. Joshi's telephone call.

14. In an affidavit prepared in response to Dr. Joshi's charge of employment discrimination, Dr. Groomes stated that she contacted Dr. Ooten and Dr. McClelland after her conversation with Dr. Joshi and cautioned them to treat Dr. Joshi fairly and to consider only job-related characteristics in determining her qualifications. She also stated that she later received an inquiry from James Vickery who suggested that someone keep Dr. Joshi advised of relevant matters concerning her interest in employment at the Center. She stated that she then phoned Dr. Ooten and reminded him of the need to communicate further with Dr. Joshi.

15. Dr. Ooten stated that he was required to post the vacancy for two weeks and that he would then receive recommendations from the screening committee and appoint the successful candidate. The trial court found that these proceedings were "probably pretextual" in that Dr. Hunter, a valued longtime employee, was

March 20, 1976, a staff physician position was posted as vacant in accordance with state personnel rules.

On March 16, 1976, Dr. Rond sent a memorandum to Dr. McHugh requesting him to re-establish the Physician's Selection Committee [16] to prepare a recommendation for the general physician choice. The committee report dated March 17, 1976, contained three recommendations: First, they recommended that Dr. Hunter be placed in the category of Staff Physician. Secondly, they recommended that Dr. Joshi's application be "tabled until the results of an advertisement have produced, or failed to produce, further applications." Finally, the committee recommended that the Health Center make an effort to employ at least two more full time physicians.

On March 19, 1976, Dr. Ooten wrote to Dr. Joshi to inform her that the position for which she was being considered was to be filled by Dr. Robert Hunter. He stated that her qualifications were impressive but that the committee had "recommended the qualifications of the person selected over those of yourself." [17] On April 2, 1976, Dr. Joshi filed charges of discrimination with the Equal Employment Opportunity Commission.

On April 23, 1976, another staff physician, Dr. Treger, resigned, creating another vacancy at the Health Center. During the spring and summer of 1976, acting director Rond sought applications for physicians at the Health Center. Although he advertised and actively recruited certain physicians,[18] he made no effort to contact Dr. Joshi to notify her of the need for additional physicians at the Center.

On June 11, 1976, the Physicians Screening Committee [19] met to review the curricula vitae on hand of doctors who had written to date about employment in order to choose one for employment in the immediate future. The committee recommended that a position be offered to Dr. Charles Freeble, III, and that interviews be set up with three additional applicants. Dr. Joshi's name was not mentioned. Dr. Freeble turned down the offer on July 19, 1976.

On July 25, 1976, an advertisement announcing the association of Dr. Joshi with Dr. Edward Clark in the practice of family medicine in Medart, Wakulla County, Florida, appeared in the *Tallahassee Democrat*. Dr. Joshi, however, testified that she never withdrew her application from the university despite this association.

In September of 1976, acting Director Rond hired two new physicians. One, Dr. Latey, was an Indian male, educated in India and certified in surgery by the Royal College of Physicians in Edinburgh, Scotland. The other, Dr. Heller, was a white male who was board certified and had 22 years of experience in the practice of family medicine. A year later, the Health Center employed Dr. Virginia Gillian, a white female who had worked temporarily at the Health Center from March 7, 1977, to June 23, 1977.

On June 14, 1978, Dr. Joshi filed suit in the United States District Court for the Northern District of Florida seeking damages and injunctive relief for the defendants' alleged violation of Title VII. The district court determined that she had made out a prima facie case of employment dis-

---

probably assured of the job before any interviewing occurred.

16. Dr. Rond apparently considered the Physicians Selection Committee to be composed of only Drs. McHugh, Go, Steele and Gagliano. However, the selection committee which actually met was composed of only Drs. McHugh, Steele and Gagliano.

17. The formal committee report signed by Dr. McHugh made no mention of the qualifications of either Dr. Hunter or Dr. Joshi. It just stated: "It was the unanimous opinion of the commit-

tee that Dr. Hunter should be placed in the new category as staff physician."

18. On March 5, Dr. Rond notified Dr. Dale, the individual who had been sixth on the list submitted by Dr. Hunter in August, 1975, that there was a vacancy at the Center for which he could be considered. Dr. Rond also wrote to Dr. Charles Freeble, III, and Dr. William Burk encouraging them to accept offers of employment at the Health Center.

19. The committee by this time was only Drs. McHugh, Steele and Gagliano.

crimination but that the defendants had successfully shown legitimate reasons for their failure to hire the plaintiff. The court concluded that the plaintiff had failed to show that the reasons given by defendant were a pretext for discrimination and that the plaintiff had failed to meet the ultimate burden of persuasion by a preponderance of the evidence that she had been discriminated against on the basis of her sex. The court, therefore, entered judgment in favor of defendants, 486 F.Supp. 86.

## II. Standard of review

Although discrimination *vel non* is essentially a question of fact, the trial court's finding of nondiscrimination is a resolution of the ultimate issue in this case. We, therefore, are not bound by the clearly erroneous standard in reviewing that finding, but must make an independent determination of appellant's allegations of discrimination. We are bound, however, by the district court's credibility determinations and findings of subsidiary fact which are not clearly erroneous. *Phillips v. Joint Legislative Committee on Performance and Expenditure Review of the State of Mississippi*, 637 F.2d 1014 (5th Cir. 1981); *East v. Romine*, 518 F.2d 332, 338–39 (5th Cir. 1975); *Causey v. Ford Motor Co.*, 516 F.2d 416, 420–21 (5th Cir. 1975).

## III. Disparate Treatment Allegations

■ To establish a prima facie case of employment discrimination, an individual Title VII plaintiff must prove (1) that he or she belongs to a class protected by the statute; (2) that he or she was seeking and was qualified for a job for which the employer was seeking applicants; (3) that, despite the fact that he or she was qualified, the individual was not selected by the employer; and (4) that after such rejection, the position remained open and the employer continued to seek applications from persons of complainant's qualifications. *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the failure to hire the plaintiff." *Texas Department of Community Affairs v. Burdine*, —— U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[20] The plaintiff must then be given an opportunity to prove by a preponderance of the evidence that the proffered justification is merely a pretext for discrimination. *Id.* 101 S.Ct. at 1094–1095. *Furnco Construction Co. v. Waters*, 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978). The ultimate burden of persuasion by a preponderance of the evidence rests on the plaintiff. *Jepsen v. Fla. Bd. of Regents*, 610 F.2d 1379, 1382 (5th Cir. 1980).

The trial court found that Dr. Joshi had made out at least the general requirements of a prima facie case under *McDonnell Douglas*.[21] The trial court determined, however, that the defendants had met their burden of showing that the decision not to hire Dr. Joshi was based on legitimate reasons that had nothing to do with her national origin or her sex and that the plaintiff had failed to show that the reasons given were pretextual.

The trial court found that Dr. Joshi's complaint of employment discrimination

---

**20.** The nature and extent of the defendant's burden of proof in explaining its actions was the subject of great debate following the *McDonnell Douglas* opinion. *See Sweeney v. Board of Trustees*, 569 F.2d 169, 177 (1st Cir.), *vacated and remanded for reconsideration per curiam*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). *See generally*, Friedman, *The Burger Court and the Prima Facie Case in Employment Discrimination Litigation: A Critique*, 65 *Cornell L.Rev.* 1, 3–11 (1979). This circuit had consistently held that the employer bears the burden of showing a legitimate reason by a preponderance of the evidence. *See Phillips v. Joint Legislative Committee, supra*,

637 F.2d at 1027 n. 22; *Burdine v. Texas Department of Community Affairs*, 608 F.2d 563 (5th Cir. 1979). The Supreme Court, however, reversing this court in the *Burdine* case held that: "the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." 101 S.Ct. at 1096.

**21.** The district court noted, however, that there was some question as to the sufficiency of her qualifications for the job. *But see* note 31 *infra*.

could be broken down into three separate situations: First, in August, 1975, when her name was fifth on the list of those recommended; secondly, from August, 1975, until January, 1976, when Dr. Hunter continued to press Dr. Ooten for his authorization to hire Dr. Joshi; and third, in March, 1976, when Dr. Hunter had resigned as director and was being interviewed along with the plaintiff for a staff physician position. Finally, the trial court found that the plaintiff was no longer actively in the running for employment at the Health Center in September of 1976, when the next hiring of new doctors took place.

■ With regard to the first instance, the district court found that Dr. Joshi had not been hired because the University was implementing an austerity program, had put a freeze on hiring and had targeted the Health Center as a special budgetary problem. There is sufficient evidence in the record to support the finding that these budgetary constraints were responsible for Dr. Ooten's authorization to hire only the first four doctors on the list of six proposed by Dr. Hunter. We, therefore, affirm the finding of nondiscrimination in this initial failure to hire the plaintiff.

■ As to the second instance, the district court found that the plaintiff was the victim of continuing budgetary problems as well as a power struggle between Dr. Hunter and Dr. Ooten over the number of staff physicians to be allowed at the Health Center and the manner in which these physicians should be selected. In response to Dr. Joshi's allegation of discriminatory treatment based on the fact that she had had to undergo further interviews after having been approved for hire, the district court found that the formation of the committee was due merely to Dr. Ooten's efforts to

accommodate the desire of staff physicians to have more input in the hiring process and the need for screening committees under affirmative action mandates. The trial court found further that the implications from Dr. Hunter's testimony that Dr. Joshi was the only physician he had ever recommended whose recommendation had been rejected were unpersuasive in light of the fact that budgetary constraints were beginning to be felt at just about the time the plaintiff was being considered for employment and that Dr. Hunter's complete control over hiring was unacceptable to several members of the Health Center staff.

Much evidence in the record makes us suspicious of the fact that Dr. Ooten decided to set up a formal screening committee to interview the plaintiff and review her application after she had already been ranked as qualified equally with five other applicants except in terms of the dates in which each had made a firm commitment to accept employment at the Health Center. For example, Dr. Ooten based his decision to authorize the hiring of the first four from this list solely on the availability of funds and the respective commitment dates of the applicants without questioning this practice. Additionally, Dr. Ooten testified that he was not competent to judge the qualifications of physicians[22] and there is no evidence to support the conclusion that he had been given any reason to question Dr. Joshi's qualifications before he requested that she be interviewed by the screening committee.[23] Moreover, although the pattern of having the "Physicians Selection Committee" meet with applicants continued in form, subsequent applicants apparently saw fewer physicians.[24]

Nevertheless, we refrain from reversing the lower court's finding of nondiscrimina-

22. Dr. Ooten was not a medical doctor. He appears to be a doctor of business administration.

23. In his January 19, 1976, memo to Dr. Hunter, Dr. Ooten stated merely "It strikes me that I should have input from the fulltime medical staff that will be working with the new physicians."

24. Dr. Mason was apparently only on the committee on January 23 when it met to interview Dr. Joshi. Dr. Go, the only other woman on the committee, was not present at either the March 17 meeting or the June 11 meeting. *Compare* notes 10, 16 and 18, *supra*.

tion in this second instance. We cannot say that the district court's findings of subsidiary fact are clearly erroneous, and evidence in the record supports the finding that the initiation of the screening process was not necessarily a discriminatory tactic aimed solely at Dr. Joshi. Additionally, there is some question as to whether there were funds available to hire any physicians during this period, as no physicians were hired at this time.[25] We conclude, therefore, that the district court did not err by finding that defendants did not act impermissibly in their failure to hire the plaintiff during this period.

With respect to the third instance, designated by the trial court as the point at which the decision was made to employ Dr. Hunter rather than Dr. Joshi, we are troubled by several facts. Defendants presented evidence to show that Dr. Hunter was chosen to fill the vacancy created by Dr. Tubbs who resigned in February, 1976, and that Dr. Hunter knew that he would have to submit to review by a screening committee before being authorized to fill a position as staff physician. However, there is evidence in the record which suggests that authorization of additional funds was not necessary for Dr. Hunter to assume the role of staff physician even if approval by a screening committee was required before he could "step down." In Dr. Hunter's memo to Dr. Ooten dated August 18, 1975, in which Dr. Hunter requested authorization to hire six physicians, the names of Dr. Hunter and Dr. Rond were included with Drs. Ferrell, Gagliano, Go, McHugh, Steele, Jones and Taylor on a list comprising the FTE physicians employed at the Health Center at that time. Thus it appears that, as far as funding was concerned, the admin-istration did not differentiate between the positions of director and staff physician. Moreover, one of the exhibits presented by defendants at trial was a memo dated September 9, 1977, to the University attorney from the administrator of the University Health Center, purporting to list all physicians employed at the Center since January 1, 1976.[26] Listed are Drs. Latey and Heller who were hired on September 20, 1976, and Dr. Virginia Gillian who was hired during 1977. Curiously absent is the name of Dr. Hunter who was supposedly hired rather than the plaintiff during March, 1976.[27] As a final point, Dr. Hunter testified that he assumed a position as staff physician January 31, 1976, that he did not know he was being considered by a screening committee during March, 1976, and that he did not understand how he had come into competition with Dr. Joshi for the position when he had full qualifications as a specialist in internal medicine, had spent six years as director and had only shifted from "one legislative line to another in the same grade [when there were] *existing position vacancies.*" [Emphasis added.]

It seems quite possible, therefore, that Dr. Joshi could have been hired to fill the vacancy created when Dr. Tubbs resigned without affecting Dr. Hunter's ability to drop into a position of staff physician. We refrain, however, from basing a reversal of the lower court's finding of nondiscrimination on this third instance because the record is not clear with regard to how many staff physicians were being sought at each time in question, and there is evidence in the record which supports the trial court's determination that Drs. Hunter and Joshi were competing for one sole vacancy and

**25.** Dr. McHugh's recommendation on January 23 that "the vacancies be advertised ..." would seem to indicate that there was already a vacancy for which the Center was seeking a physician at the time Dr. Joshi was interviewed, and Dr. Hunter was of the impression that funds were available throughout this period; however, the first vacancy which clearly occurred was in February when Dr. Tubbs resigned.

**26.** *Defendants presented this exhibit in an effort to substantiate their claim that they hired large percentages of women and minorities.*

**27.** Additionally, we find inherently suspect the fact that Dr. Mason, a black female physician who had made some efforts to intervene on behalf of the plaintiff, was told specifically by Dr. Rond not to tell Dr. Joshi that Dr. Tubbs was resigning.

that Dr. Hunter was selected because of his long service as Director.

■ We base our reversal on the district court's erroneous determination that the plaintiff was not discriminated against when Drs. Heller and Latey were hired because she was no longer actively in the running for employment at the Health Center at that time. There is simply no evidence to support this conclusion.

The district court apparently based its finding that Dr. Joshi was no longer actively in the running for employment on the fact that Dr. Joshi had placed a notice in the *Tallahassee Democrat* advertising her association with another doctor in the practice of family medicine.[28] The fact that this ad appeared in the paper, however, is insufficient to support a finding that the defendants did not consider Dr. Joshi's application because they believed that she was employed elsewhere and, therefore, was no longer interested in employment as a staff physician at the Health Center. Only one defendant, Dr. Rond, testified that he had seen the ad, and he testified on cross-examination that it had no significance for him and that, as far as he knew, she was still interested in employment. Moreover, the ad did not appear in the newspaper until July, 1976, and, therefore, can not even be considered as an explanation for the defendants' failure to consider Dr. Joshi's application at the June 11, 1976, meeting of the physicians screening committee to review the applications then on file.[29]

The evidence overwhelmingly supports the conclusion that Dr. Joshi remained actively in the running for employment at the Health Center during the time period after she was notified that Dr. Hunter had been selected to fill a position as staff physician. As we stated above, the screening committee recommended that her application be "tabled" not "dropped," and Dr. Joshi testi-

fied that she did not withdraw her name. The letter from Dr. Ooten to Dr. Joshi informing her that Dr. Hunter had been selected did not tell her that she would have to resubmit her application to be considered for future vacancies, and Dr. Joshi had already been considered at least twice after having made only one formal application. Moreover, the record contains an affidavit prepared June 3, 1976, by Dr. Groomes in response to the charge of employment discrimination by Dr. Joshi in which Dr. Groomes stated, inter alia, "I have discussed [Dr. Joshi's] interest in employment with appropriate University officials and have reaffirmed with them that her application be considered fairly and that she continue to be advised regarding her status as a candidate for any vacancies which might occur at the University Health Center." Most significant as to this issue is the statement made on the defendant's behalf by their counsel in replying to Dr. Joshi's EEOC charge. This statement is: "At the time she filed this charge (April 8, 1976) she was eligible for consideration for vacancies at the University Health Center. *She would be considered for future vacancies should they occur.*" [Emphasis added.] This statement belies the contention that when Dr. Freeble was offered a position after June 11, 1976, Dr. Joshi was no longer a candidate for the opening. The same is true with respect to the employment of two doctors in September, 1976.

A similar case was recently decided by this Court. In *Phillips v. Joint Legislative Committee*, 5 Cir., 637 F.2d 1014, 1027–28 (1981), we reversed the district court's finding that the defendant's failure to hire a black female applicant was based on a legitimate belief that she was already employed. The trial court had accepted the defendant's explanation that the plaintiff would

---

**28.** The district court also referred to the fact that the committee which had recommended that Dr. Hunter be hired had also recommended that Dr. Joshi's application be "tabled." However, this report did not indicate that Dr. Joshi's name should be dropped from

consideration but merely that her application should be held in abeyance until further advertising had produced, or failed to produce, a wider pool of applicants.

**29.** See note 18 *supra*.

have been hired had newspaper and television reports not indicated to them that she was already employed. The court found that the plaintiff failed to show that the reason given was a pretext. In reversing we stated:

> We do not mean to say that Title VII always requires an employer to pursue black applicants even after they are hired elsewhere. We hold only that, on the record in this case, we cannot avoid the conclusion that the reason offered was a convenient way out of an uncomfortable decision—in other words, a pretext.

At 1028. Likewise, we conclude that the fact that Dr. Joshi announced in July, 1976, her association with another doctor fails to constitute a legitimate reason for their refusal to consider Dr. Joshi [30] as an applicant for a position of staff physician.

Thus, contrary to the district court's determination, we find that she was actively in the running for a position as staff physician during the time period following receipt of her last letter from Dr. Ooten. In light of this finding, we conclude that Dr. Joshi made out a prima facie case of employment discrimination in this final instance under the *McDonnell Douglas* standards and that the defendants have as yet failed to show a legitimate reason for their failure to hire her. She is a woman and thus a member of a class protected by Title VII. She had applied, and was qualified [31] for a position for which the Health Center was actively recruiting applicants. The defendants made offers of employment to at least four male physicians during the period in question and ultimately hired two men to fill positions for which Dr. Joshi was qualified.

Since the trial court found that Dr. Joshi was no longer in the running for employment following Dr. Hunter's being placed in a position as staff physician, the trial court did not reach the question of whether the defendants met their burden under *Burdine* as to this final time period.[32] On remand, the district court must determine whether the defendants produced or are now able to offer evidence of a legitimate, nondiscriminatory reason explaining their failure to hire Dr. Joshi and produced evidence that those ultimately chosen had qualifications equal to those of the plaintiff. *Burdine, supra. See Panlilio v. Dallas Independent School District,* 643 F.2d 315 (5th Cir. 1981). If the trial court determines that the defendants have met or are able to meet this burden, the plaintiff must then have an opportunity "to demonstrate that the proffered reason was not the true reason for the employment decision." *Burdine, supra,* 101 S.Ct. at 1095.

30. One wonders what the trial court would have expected her to do while waiting around for budget conditions (the only bar to her being hired originally) to permit her to be hired. We would not expect her to sit idly by instead of engaging in a medical practice until notified finally of the outcome of her request for employment by the defendants.

31. The trial court indicated that she might not be qualified for the job; however, there is no foundation for this conclusion. She was initially found to be qualified and recommended by Dr. Hunter by the procedure then practiced at the Health Center. She then, at Dr. Ooten's insistence, interviewed with a group of physicians who stated that they found her to be "well-qualified for the position." Her qualifications were admittedly considered sufficient to place her in the running against Dr. Hunter and in notifying her that Dr. Hunter had been selected, Dr. Ooten stated "your qualifications were impressive ..." Additionally, in her affidavit, Dr. Groomes stated "it was determined upon the basis of my conversation with Dr. Ooten that ... she was not unqualified for any position as a staff physician."

32. The trial court seems to have been persuaded by defendant's good track record in hiring women and minorities which showed that, during the time period in question, defendants employed greater proportions of women and minorities than were available in the labor market. The district court found that the Health Center, which maintains a staff of approximately 10 doctors, has employed a Filipino woman, a black woman, a white woman, an Indian male and a black male as staff physicians. While such statistical evidence might be relevant to negate an inference of discriminatory motive, it is insufficient to rebut the prima facie case of a specific individual in a disparate treatment case. *See Cross v. United States Postal Service,* 639 F.2d 409 (1981).

The judgment is reversed and the case is remanded for further proceedings not inconsistent with this opinion.[33]

REVERSED and REMANDED.

---

33. If on remand the district court determines that Dr. Joshi's gender was a factor in the defendant's failure to consider her application but that she would not have been hired in any event because those chosen were thought to be, for any nondiscriminatory reason, better suited for the position, Dr. Joshi would not be entitled to back pay; however, the trial court should consider whether she might be entitled to other relief, if only nominal damages, which would carry with it attorneys fees. *See Gillin v. Federal Paper Board Co., Inc.,* 479 F.2d 97 (2d Cir. 1973); *Saracini v. Missouri Pacific Railroad Co.,* 431 F.Supp. 389 (E.D.Ark.W.D.1977).