**Elizabeth JIMENEZ, Plaintiff,**

v.

**DYNCORP INTERNATIONAL, LLC, Defendant.**

**Civil Action No. 3:08–CV–174–KC.**

United States District Court, W.D. Texas, El Paso Division.

July 13, 2009.

---

John A. Wenke, Attorney at Law, El Paso, TX, for Plaintiff.

Michael D. McQueen, Kemp Smith LLP, El Paso, TX, for Defendant.

## ORDER

KATHLEEN CARDONE, District Judge.

On this day, the Court considered Defendant Dyncorp International, LLC's Motion for Summary Judgment ("Motion") (Doc. No. 27); Plaintiff Elizabeth Jimenez's Response to Defendant's Motion for Summary Judgment ("Response") (Doc. No. 30); and Defendant's Reply to Plaintiff's Summary Judgment Response ("Reply") (Doc. No. 34).[1] For the reasons set

---

1. In conjunction with the above-cited documents, the Court also considered Defendant's "Errata to Defendant's Reply to Plaintiff's Summary Judgment Response" (Doc. No. 33); Plaintiff's Objections to Defendant's Affidavits in Support of Defendant's Motion for Sum-

forth herein, Defendant's Motion is **DE-NIED.**

# I. BACKGROUND

## A. Introduction

Plaintiff brings her claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Pl.'s First Am. Compl. ¶ 3.

## B. Factual History

The Court derives the following facts from the parties' pleadings, Defendant's "Proposed Undisputed Facts" ("Defendant's Facts"), appended to Defendant's Motion; Plaintiff's "Statement of Relevant Facts" ("Plaintiff's Facts"), appended to Plaintiff's Response; and from various exhibits attached to the parties submissions. Unless otherwise indicated, these facts are undisputed.

Plaintiff resides in El Paso, Texas, and is a twice-divorced mother of two children. Pl.'s First Am. Compl. ¶ 1; Pl.'s Mot. Ex. A (Jimenez Dep. Dec. 3, 2008) at 7:10–19, 10:6–23.

Defendant is a corporation with its principal office located in Texas. Pl.'s First Am. Compl. ¶ 2. Defendant has contracted with the U.S. Department of State International Narcotics & Law Enforcement Affairs Bureau to run the CIVPOL program, which provides police advisors to countries around the world. *See* Def.'s Mot. App. (Marr Aff.) ¶ 1; Jimenez Dep. 205:14–16. Candidates for the CIVPOL program must complete initial application forms on Defendant's web site when applying for a

position. Marr Aff. ¶ 2; Def.'s Facts ¶¶ 1–2. If Defendant selects a candidate for employment, the candidate must undergo the Police Assessment Selection and Training ("PAST") program. Mar Aff. ¶ 2. The PAST program is conducted over fifteen days in Fredericksburg, Virginia, by Crucible, an independent contractor. *Id.* ¶ 4(1).[2] In addition to various training courses, the PAST program includes three major assessments that candidates must pass before ultimately being hired by Defendant and deployed. *Id.* ¶ 3. These assessments are a physical fitness and agility test, an oral boards review, and a psychological evaluation. *Id.* ¶ 4(1). While Defendant is directly involved in the oral boards interviews, Defendant contracted with Crucible to administer the fitness and agility tests. *Id.* Defendant has further contracted with Mission Critical Psychological Services, LLC ("Mission Critical") to conduct the psychological evaluations and determine a candidate's mental suitability for the mission. *Id.* ¶¶ 4(1)-(2). Mission Critical employs a group of psychologists called Frontline Psychology ("Frontline"), to perform the psychological evaluations. Def.'s Facts ¶ 14.

In 1997, Plaintiff joined the El Paso Police Department. Jimenez Dep. 16:13–14, 202:11–15. In the summer of 2007, Plaintiff applied for work with Defendant. Def.'s Facts ¶ 1; Jimenez Dep. 37:13–15. After Plaintiff filled out the necessary online applications, Defendant contacted Plaintiff and gave Plaintiff a conditional offer of employment. The position was in the CIVPOL program as an adviser to instructors at an all-female police academy in Kabul, Afghanistan.[3] Jimenez Dep.

---

mary Judgment (Doc. No. 29); and Defendant's Response to Plaintiff's Objections to Defendant's Summary Judgment Affidavits (Doc. No. 32). Insofar as Defendant's Affidavits are incorporated into this Order, Plaintiff's Objections are overruled.

**2.** Defendant has labeled two consecutive paragraphs in the Marr Affidavit as para-

graph 4. The number in parentheses is to indicate "paragraph 4" to which the Court is citing.

**3.** Plaintiff had initially applied for a position in Iraq but was later convinced by one of Defendant's female recruiters to seek the position in Afghanistan because the "opportunities for advancement were far greater" there.

46:19–47:14; 48:6–9, 205:8–11; Def.'s Facts ¶ 8. Defendant's conditional offer of employment advised Plaintiff not to make any permanent decisions concerning her employment or living arrangements until after she had successfully completed the PAST program. Jimenez Dep. 53:6–10. However, the offer also stated that an employee who is hired does not return home before being deployed. *Id.* at 62:25–63:63:3, 206:7–11. Accordingly, the offer advised Plaintiff to bring everything she would need for the year in Afghanistan, including clothing, a year's worth of medication, extra contacts and eyeglasses, a voltage converter, and a laptop computer. *Id.* at 206:14–207:21.

In preparation for her deployment, Plaintiff submitted her resignation to the El Paso Police Department, and she returned her police equipment. *Id.* at 62:19–65:9. Plaintiff also quit her second job as a security guard at Dillard's department store. *Id.* at 65:14–15.

Plaintiff then travelled to Fredericksburg, Virginia, for the PAST program. *Id.* at 69:13–19. Plaintiff was the only female out of forty-two candidates attending the PAST program at that time. *Id.* at 215:1–9. While at the PAST program, Plaintiff attended several days of training and examinations, including cultural diversity training, sexual harassment training, fitness and agility tests, firearms tests, oral boards, and vaccinations. *Id.* at 74:5–17, 77:19–24, 78:5–20.

Plaintiff also underwent the psychological evaluation. *Id.* at 77:19–24. Plaintiff's psychological evaluation was performed by Dr. Frank Andrasik, a Ph.D. psychologist, and employee of Frontline. Def.'s Facts ¶ 10; Def.'s Mot. Ex. D (Andrasik Dep. Feb. 25, 2009) at 9:6–20. Dr. Andrasik initially gave Plaintiff a passing score on the psychological evaluation.[4] *See* Andrasik Dep. Ex. 3 ("Evaluation"); *id.* at 99:6–7. However, Dr. Andrasik stated that he had concerns about Plaintiff's abilities, and that he subsequently met with the other two psychologists employed by Frontline to discuss his observations.[5] *Id.* at 99:11–16. After discussing his observations, Dr. Andrasik and the two other psychologists at Frontline reached a consensus that Plaintiff was not psychologically suited for the mission to Afghanistan; Dr. Andrasik consequently changed his evaluation score to a failing score. *Id.* at 99:17–21. Dr. Andrasik later provided Defendant with a report further explaining his decision. *See id.* at 100:8–101:9.

The following day, Plaintiff and two male candidates were pulled out of class early in the day. Jimenez Dep. 79:2–16. A Crucible employee informed Plaintiff and the other two candidates that they had failed their psychological examinations and were being sent home on the next available flight. *Id.* at 81:10–12. Plaintiff and the two candidates were further informed that the psychological exam was noncontestable. *Id.* at 81:24–15. Plaintiff and the two

Jimenez Dep. 42:12–21; *see also id.* at 46:16–18, 59:2–10; Def.'s Facts ¶¶ 6–7.

4. On his evaluation, Dr. Andrasik gave Plaintiff a 6 on a scale of 1 to 10, with 6 being the lowest passing score. Andrasik Dep. 9:6–10; Evaluation. However, Dr. Andrasik also noted that Plaintiff was on the "bubble" or "on the fence" of not passing. *Id.*

5. Mission Critical protocol requires that the psychologists meet to discuss borderline candidates, including those the interviewing psychologist would either barely pass or fail. Def.'s Mot. App. (Brand Aff.) ¶ 6. The psychologists are not permitted to reject a candidate unless the psychologists in the meeting unanimously agree that this is the proper decision. *Id.* Defendant employees are not permitted to attend these meetings or to offer any input into the psychological evaluation decisions. *Id.*

candidates were then taken into another room where one of Defendant's employees confirmed that they had failed the psychological evaluation, that the results were "noncontestable," and that they were going to be on the first flight home. *Id.* at 82:16–18, 84:5–13. Plaintiff later received a letter from Defendant confirming that she was no longer being considered for a position.[6] *Id.* at 214.

Upon returning to El Paso, Plaintiff rescinded her letter of resignation from the El Paso Police Department and returned to her former duties after a week of desk work. *Id.* at 215:10–216:3. However, because of the nature of her nonselection at the PAST program, the El Paso Police Department required Plaintiff to undergo an additional psychological evaluation, which Plaintiff subsequently passed. *Id.* at 216:15–217:5.[7]

### C. Procedural History

After complying with all administrative prerequisites, Plaintiff filed her Original Petition in the County Court at Law Number Six, El Paso County, Texas on April 18, 2008. *See* Notice of Removal 6–10. Defendant removed the case to this Court, *id.* at 1, and on June 27, 2008, Plaintiff filed her First Amended Complaint (Doc. No. 12). In her First Amended Complaint, Plaintiff claimed that she was denied employment with Defendant because Dr. Andrasik gave Plaintiff a failing score in her psychological evaluation based on gender discrimination in violation of Title VII. Pl.'s First Am. Compl. ¶¶ 3, 13. As evidence of this discrimination, Plaintiff alleged that during her psychological evaluation, Dr. Andrasik made several comments

about her looks, including comments that she was very pretty and that her looks would cause her problems in her training and mission; he asked how she was handling the fact that she was the only female in a group of forty one men; he asked how she would deal with working with males as a police advisor; and he made several comments about her child-bearing history, including the age of Plaintiff's first child, Plaintiff's young age when she gave birth, and the fact that Plaintiff's first child was born out of wedlock. *Id.* ¶ 10.

Defendant has failed to file an Answer to Plaintiff's Amended Complaint.

On May 11, 2009, Defendant filed the instant Motion. Plaintiff filed her Response on May 26, 2009, and Defendant filed its Reply on June 10, 2009.

## II. DISCUSSION

### A. Summary Judgment

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Warfield v. Byron,* 436 F.3d 551, 557 (5th Cir.2006). The substantive law identifies which facts are material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202,(1986); *Ellison v. Software Spectrum, Inc.,* 85 F.3d 187, 189 (5th Cir. 1996). A dispute about a material fact is

---

**6.** The letter, which Plaintiff received October 3, 2009, made no reference to Plaintiff having failed the psychological evaluation, and stated only: "After a detailed review of your qualifications, we are currently considering other candidates who are a closer match to the requirements of the mission, and we are not

able to offer you a position at this time." Jimenez Dep. 214:16–20.

**7.** Plaintiff had undergone an initial psychological evaluation when she first applied to the El Paso Police Department, which she had also passed. *Id.* at 21:5–22:24.

genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Ellison*, 85 F.3d at 189.

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323,.106 S.Ct. 2548; *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046–1047 (5th Cir.1996). If the moving party meets its initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). The nonmovant's burden may not be satisfied by "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Warfield*, 436 F.3d at 557 (quoting *Freeman v. Texas Dep't of Crim. Justice*, 369 F.3d 854, 860 (5th Cir.2004)). Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). Thus, the ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

### B. Title VII Burden–Shifting Framework

■ When there is no direct evidence of unlawful discrimination, a plaintiff may prove a Title VII case with circumstantial evidence, using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir.2007); *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 593 (2007) (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir.2001), *cert. denied*, 535 U.S. 1078, 122 S.Ct. 1961, 152 L.Ed.2d 1022 (2002)).

■ Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination. *Nasti*, 492 F.3d at 593 (citing *Wallace*, 271 F.3d at 219) (addressing sex discrimination). The elements of a prima facie case vary depending on the nature of the discrimination and its effect on plaintiff's employment. *See infra*. However, once a plaintiff has demonstrated a prima facie case, the employer then bears the burden of producing a legitimate, non-discriminatory reason for its actions. *Nasti*, 492 F.3d at 593 (citing *Wallace*, 271 F.3d at 219). "Once the employer offers a legitimate, nondiscriminatory reason for the plaintiff's treatment, the presumptions of the *McDonnell Douglas* framework dissipate, and the plaintiff bears the ultimate burden of persuading the trier of fact that the defendant engaged in intentional discrimination." *Nasti*, 492 F.3d at 593 (citing *Wallace*, 271 F.3d at 219; *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir.2000)). Plaintiff must then present substantial evidence to demonstrate that Defendant's legitimate nondiscriminatory reasons are pretext for the unlawful discrimination. *See id.*

### C. Defendant's Liability for Dr. Andrasik's Decision

Plaintiff's claims of gender discrimination derive exclusively from Dr. Andrasik's decision not to give her a passing score based on her psychological evaluation. However, it is undisputed that Dr. Andrasik was not one of Defendant's employees. Rather, Dr. Andrasik was an employee of Frontline, which was part of Mission Criti-

cal, which contracted with Defendant to provide psychological evaluations for Defendant's PAST program, which was run by Crucible. Therefore, Defendant argues that, even assuming Dr. Andrasik unlawfully discriminated against Plaintiff by improperly considering her gender when deciding to give Plaintiff a failing score on her psychological evaluation, Defendant cannot be liable for relying on the opinion of an independent professional when making its hiring decisions. Def.'s Mot. 8. Defendant's argument is in error.

■ The Supreme Court has declared that an "important purpose" of Title VII is "that the workplace be an environment free of discrimination, where race is not a barrier to opportunity." *Ricci v. DeStefano*, 557 U.S. ——, 129 S.Ct. 2658, 2674, 174 L.Ed.2d 490 (2009). The Supreme Court has further stated that the purpose of Title VII "is to promote hiring on the basis of job qualifications, rather than on the basis of [a protected characteristic]." *Id.* at 2675 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (discussing "race" and "color")). To achieve these purposes, Title VII makes it unlawful for an "employer" "to fail or refuse to hire ... any individual, or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex[.]" 42 U.S.C. § 2000e-2(a)(1). Title VII includes in its definition of employer "any agent of such person[.]" *Id.* § 2000e(b). "Like all of Title VII's provisions, the phrase 'any agent' should be accorded a liberal construction." *Harvey v. Blake*, 913 F.2d 226, 227 (5th Cir.1990) (citations omitted). The Supreme Court has further held that by including the term "agent" as part of the definition for "employer," "Congress wanted courts to look to [common law] agency principles for guidance in this area." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (explaining that "Congress has directed federal courts to interpret Title VII based on agency principles"); *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 383 (5th Cir.2003).

■ The Restatement (Second) of Agency states that an agency relationship exists "if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act." RESTATEMENT (SECOND) OF AGENCY § 15 (1957); *see also* RESTATEMENT (THIRD) OF AGENCY § 1.01 cmt. c (2006) ("[T]he concept of agency posits a consensual relationship in which one person, to one degree or another or respect or another, acts as a representative of or otherwise acts on behalf of another person with power to affect the legal rights and duties of the other person."). Given these principles, the Court agrees that "[a] person is an agent under § 2000e(b) if he participated in the decision-making process that forms the basis of the discrimination." *Hamilton v. Rodgers*, 791 F.2d 439, 443 (5th Cir.1986) (citation omitted), *abrogated on other grounds by Harvey*, 913 F.2d at 227; *see also Harvey*, 913 F.2d at 227; *Cuesta v. Tex. Dep't of Criminal Justice*, 805 F.Supp. 451, 455 (W.D.Tex. 1991) (under traditional agency principles, a party is an "agent" of an employer if that party has the power to "hire, fire, and perform other employer functions"); *Williams v. Montgomery*, 742 F.2d 586, 589 (11th Cir.1984) ("Where the employer has delegated control of some of the employer's traditional rights, such as hiring or firing, to a third party, the third party has been found to be an 'employer' by virtue of the agency relationship.") (citation omitted), *cert. denied*, 470 U.S. 1053, 105 S.Ct. 1756, 84 L.Ed.2d 819 (1985).

Given the liberal interpretation afforded to Title VII definitions, and given the common-law principles governing agency, the Court holds that Dr. Andrasik and Frontline were Defendant's "agents" when determining whether Plaintiff was psychologically suited to perform her mission in Afghanistan. It is undisputed that Dr. Andrasik's decision to give Plaintiff a failing score on her psychological evaluation was the sole basis upon which Defendant immediately terminated Plaintiff from the PAST program and rescinded Plaintiff's conditional offer of employment. Defendant provided no further review of Dr. Andrasik's or other Frontline psychologists' decisions before deciding not to hire Plaintiff. Indeed, Defendant's director of police training, Michael Mack, has stated that there is no appeals process for a psychologist's determination and that once a candidate fails the evaluation, that is the end of that candidate's immediate opportunity for employment with Defendant. *See* Pl.'s Resp. Ex. C (Mack Dep. May 19, 2009) at 7:14–19. Mack further stated that that to his knowledge, "the findings from a psychologist has [sic] never been reversed." *Id.* at 8:21–22. Given these facts, it is clear that Defendant delegated to Dr. Andrasik and Frontline the power to "hire, fire, and perform other employer functions." *Cuesta,* 805 F.Supp. at 455. At the very least, Dr. Andrasik and the other psychologists at Frontline "participated in the decision-making process that forms the basis of the [alleged] discrimination." [8] *Hamilton,* 791 F.2d at 443.

Defendant cites *Crocker v. Runyon,* 207 F.3d 314, 317 (6th Cir.2000) for the proposition that an employer cannot be held liable for unlawful discrimination when making its hiring decisions if the employer relies in good faith on the independent opinion of qualified subcontractors. Def.'s Mot. 10–11. In *Crocker,* the "[t]he Postal Service relied on the opinions of two private physicians, including a neurological specialist, in reaching its decision not to hire [the plaintiff]." *Crocker,* 207 F.3d at 319. The Sixth Circuit held that "[e]ven if the … medical opinions were demonstrably flawed, the Postal Service's reasonable reliance upon them is not discriminatory." *Id.* (citing *Severino v. N. Fort Myers Fire Control Dist.,* 935 F.2d 1179, 1182 (11th Cir.1991)). "So long as the Postal Service relied on those opinions in good faith in determining that [the plaintiff] could not do the job, the failure to hire him was justified." *Id.* (citing *Pesterfield v. Tenn. Valley Auth.,* 941 F.2d 437, 443 (6th Cir. 1991)).

The first difference the Court notes between *Crocker* and the instant case is that the plaintiff in *Crocker* sued under the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.,* and not Title VII. *See Crocker,* 207 F.3d at 314. The Rehabilitation Act incorporates the definitions of the Americans with Disabilities Act, 42 U.S.C. § 12111, et seq. ("ADA") "as such sections relate to employment" when determining "whether this section has been violated." 29 U.S.C. § 794(d). Like under Title VII, the definition of employer under the ADA includes "any agent" of the employer. *Compare* 42 U.S.C. § 12111(5)(A) *with* 42 U.S.C. § 2000e(b). Nonetheless, "[w]hile there may be areas of common definition, [the Court] must be careful not to apply rules applicable under one statute to a different statute without careful and criti-

---

**8.** The Court also notes that while Defendant has an anti-discrimination policy, no safeguards were in place to prevent Defendant's employees (or prospective employees) from being subject to discriminatory practices of Defendant's contractors. Mack Dep. 10:19–11:7, 32:1–13. In addition, there is no evidence that Defendant's anti-discrimination policy was ever communicated to Dr. Andrasik. *See* Andrasik Dep. 18:19–24.

cal examination." *Federal Express Corp. v. Holowecki*, —— U.S. ——, 128 S.Ct. 1147, 1153, 170 L.Ed.2d 10 (2008) (citation omitted); *see also Gross v. FBL Fin. Servs., Inc.*, —— U.S. ——, 129 S.Ct. 2343, 2349, 174 L.Ed.2d 119 (2009). "This is so even if ... the same definition ... appl[ies] in more than one type of discrimination case." *Holowecki*, 128 S.Ct. at 1153. Neither party has provided detailed arguments on this issue, and it is unclear to the Court that an agent of an employer under the Rehabilitation Act shares the same definition as an agent of an employer under Title VII.[9]

In addition to difference in statutory basis for this case and *Crocker*, the plaintiff in *Crocker* never argued that the doctors providing medical opinions were agents of the federal government. Consequently the court in *Crocker* never reached the issue before this Court. In fact, the court in *Crocker* stated that the only factual issue before it was whether the plaintiff was otherwise qualified to perform his job, despite his disability. *Crocker*, 207 F.3d at 319. There was no allegation in *Crocker* that those making the medical determinations acted with discriminatory intent, only that they were objectively flawed in their

conclusions. *See id.* The plaintiff in *Crocker* was also given the opportunity to provide evidence rebutting the hiring authority's showing that he was otherwise qualified for the position at the time he was denied employment. *See id.* at 320. However, the plaintiff in *Crocker* failed to do so. *Id.* As there was no evidence of discrimination in the independent reports, and in fact no contemporaneous evidence that the reports were flawed, the Court in *Crocker* naturally found that good-faith reliance on unbiased reports showed no discrimination.[10] *Id.*; *see also Severino*, 935 F.2d at 1182; *Pesterfield*, 941 F.2d at 443.

██ In the instant case, Defendant conducted no further review of Dr. Andrasik's evaluation before rescinding its hiring offer and informing Plaintiff that the decision was "noncontestable." In fact, it appears that Defendant completely delegated its hiring decision-making authority to Dr. Andrasik and Frontline. Frontline psychologists were required to provide no reasons for why a candidate failed his or her psychological evaluation before Defendant's representatives at the PAST program withdrew the candidate's conditional offer. Mack Dep. 27:16–19,

---

9. This is particularly true because the employer in *Crocker* was the federal government and the employer in the instant case is a private party. Specific statutes and regulations govern when an independent third party may act as an "agent" of the federal government, whereas common law agency principles govern when a party is the "agent" of an employer under Title VII. *Compare, e.g.,* 16 U.S.C. § 831c(h) (making Tennessee Valley Authority an agent of the United States); 44 C.F.R. § 61.5(e), (i) (stating that casualty insurance agents are not agents of the United States when making representations regarding the extent and scope of coverage for a standard flood insurance policy) *and Staten v. Housing Auth. of Pittsburgh*, 638 F.2d 599, 603 (3d Cir.1980) (question of whether an entity may act as agent of the federal government is a question of federal law) *with Ellerth*, 524 U.S.

at 754, 118 S.Ct. 2257 (common law agency principles dictate when a party is an agent of an employer under Title VII).

10. Despite the court in *Crocker* stating that it allows for "good-faith reliance" on potentially flawed reports, the court in *Crocker* appears nonetheless to treat the reasonableness of those reports as questions of fact. *See Crocker*, 207 F.3d at 320 (comparing the reports to the report in *Holiday v. Chattanooga*, 206 F.3d 637 (6th Cir.2000), where the doctor failed to consider certain evidence); *see also Severino*, 935 F.2d at 1182 (noting the changing circumstances involving the understanding of HIV and the reasonableness of the reports); *Pesterfield*, 941 F.2d at 443 (noting that the case went to a jury and including in the opinion one of the doctor's reports in full).

31:5–17. Indeed, Defendant's hiring authority stated that he acted immediately upon receiving verbal notice that a candidate failed the psychological evaluation and put that person on a flight home. *Id.* Neither Defendant nor any other of Defendant's representatives had any say in the determination. *Id.* at 31:18–20. While the ultimate hiring decision may have remained with one of Defendant's employees, and while there is no evidence that this employee acted with discriminatory intent, "if [an] official decisionmaker 'merely rubber stamped' the wishes of others, that decisionmaker ... inherit[s] the discriminatory taint." *Russell,* 235 F.3d at 226–27 (quoting *Long v. Eastfield Coll.,* 88 F.3d 300, 306 (5th Cir.1996) (Title VII case)).

■ In conclusion, assuming gender discrimination played a role in Dr. Andrasik's and Frontline's decision making, the Court does not read Title VII to allow Defendant to escape liability simply because it delegated its hiring power to a third party.[11]

### D. Plaintiff's prima facie case

Defendant next argues that Plaintiff's claim of unlawful discrimination fails because Plaintiff cannot establish a prima facie case. Def.'s Mot. 11–12.

■ To establish a prima facie case of employment discrimination in a Title VII failure-to-hire case, an individual plaintiff must prove (1) that she belongs to a class protected by statute; (2) that she was seeking and was qualified for a job for which the employer was seeking applications; (3) that, despite the fact that she was qualified, the individual was not selected by the employer; and (4) that after such rejection, the position remained open and the employer continued to seek applications from persons of complainant's qualifications. *See Joshi v. Fla. State Univ.,* 646 F.2d 981, 986 (5th Cir.1981) (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817 (failure to hire case)); *Daves v. Payless Cashways, Inc.,* 661 F.2d 1022, 1025 (5th Cir.1981).

Defendant argues Plaintiff cannot present a prima facie case for two reasons. Def.'s Mot. 11–12. The Court will address each argument in turn.

### 1. Whether Plaintiff is qualified for the position

■ Defendant first argues that Plaintiff has not shown that she was qualified for the position. Def.'s Mot. 11–12. Only a minimal showing is necessary to make a prima facie case. *Bauer v. Albemarle Corp.,* 169 F.3d 962, 967 (1999). The only dispute in the instant case is

**11.** While not directly on point, additional statements in Supreme Court opinions interpreting Title VII support this reading. *See Los Angeles Dep't of Water & Power v. Manhart,* 435 U.S. 702, 718 n. 33, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978) ("We do not suggest, of course, that an employer can avoid his responsibilities [under Title VII] by delegating discriminatory programs to corporate shells."), *superseded on other grounds by* The Civil Rights Act of 1991, Pub. L. No. 102–166, 105 Stat. 1071 (1991); *Az. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris,* 463 U.S. 1073, 1089, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983) (Marshall, J., concurring in the judgment in part) ("Since employers are ultimately responsible for 'compensation, terms, conditions, [and] privileges of employment' provided to the employees, an employer that adopts a ... scheme that discriminates on the basis of ... sex ... violates Title VII regardless of whether third parties are also involved in the discrimination."); *see also Ford Motor Co. v. NLRB,* 441 U.S. 488, 501, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979) (holding that the selection of an independent contractor to provide a service under the National Labor Relations Act did not change the fact that such service was an aspect of the relationship between the employer and employee).

whether Plaintiff met the psychological qualifications for the job. Defendant has not argued that Plaintiff was unqualified in any other respect. Indeed, the evidence shows that Plaintiff appeared sufficiently qualified for the job that Defendant accepted her application online, extended a conditional offer of employment, and flew Plaintiff across the country for final training before deployment. There is also no evidence that Plaintiff subsequently failed the oral boards or fitness tests at the PAST program. Defendant argues, however, that "[a] panel of highly-qualified psychologists, experienced in making such assessments, reached the conclusion that Plaintiff was not suited and thus, not qualified for the position.... Plaintiff has no evidence that she has been found qualified in *any* psychological evaluation of suitability for service on an overseas mission in the Middle East." *Id.* at 12 (emphasis in original).

■■■ Defendant concedes that the decision not to recommend Plaintiff for the position was a subjective decision based on Dr. Andrasik's clinical judgment. *See* Andrasik Dep. 50:8–13. "Subjective criteria should not be considered a part of the *prima facie* evaluation in a summary judgment proceeding." *Lindsey v. Prive Corp.,* 987 F.2d 324, 327 (5th Cir.1993) (ADEA case) (emphasis in original).[12] To allow subjective criteria as part of the prima facie stage "would in many instances collapse the three step analysis into a single initial step at which all issues would be resolved" and thus "defeat the purpose underlying the *McDonnell Douglas* process." *Id.* (quoting *Burrus v. United Tel. Co. of Ka., Inc.,* 683 F.2d 339, 342 (10th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982) (Title VII

case)). Moreover, allowing the Court to disregard subjective judgments at the prima facie stage "will not require second guessing of the defendant's personnel decisions but, rather, will require an evaluation of the credibility of the defendant's testimony about the reasons for that decision[;] the trier-of-fact will evaluate truthfulness, not [the subjective criteria]." *Id.; see also Crawford v. Western Elec. Co., Inc.,* 614 F.2d 1300, 1315 (5th Cir.1980) (Title VII case); *Rowe v. Gen. Motors Corp.,* 457 F.2d 348, 358–59 (5th Cir.1972) (Title VII case).

Accordingly, the Court finds that the evidence on the record allows for a prima facie showing that Plaintiff may have been qualified to for the position in Afghanistan.

## 2. Whether Plaintiff has shown she was otherwise discriminated against

After showing she is qualified for the position, Plaintiff must meet the remaining factors for a prima facie case. Defendant next argues that Plaintiff cannot demonstrate that someone who does not have her protected characteristic was hired in her place, thus failing the fourth *McDonnell Douglas* factor. Def.'s Mot. at 12. As Plaintiff was seeking a position as an advisor at an all-female academy, Defendant argues that "Plaintiff will never be able to proffer evidence to satisfy this element of a prima facie case[.]" *Id.*

Plaintiff argues, however, that the Court should apply a different standard for determining whether a party has established prima facie case in a Title VII failure-to-hire case than the traditional interpretation of *McDonnell Douglas.* Plaintiff argues that a party may demonstrate discrimination by showing that in addition to

---

**12.** As will be discussed *infra,* the analyses and statutory history of the ADEA and Title VII are not identical, and the Court would be in error to cite ADEA cases indiscriminately for

Title VII purposes. However, the Fifth Circuit in *Lindsey* cites to Title VII cases for its authority regarding subjective factors in a prima facie case. *See Lindsey,* 987 F.2d at 327.

applying and being qualified for a position, a plaintiff may show she was "either (a) replaced by someone outside of the protected class, or (b) treated less favorably than a similarly-situated employee outside of the protected class, or (c) otherwise subjected to an adverse employment action because of her protected status." Pl.'s Resp. 5 (citing *Smith v. City of Jackson,* 351 F.3d 183, 196 (5th Cir.2003); *Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 309 (5th Cir.2004)).

A review of Fifth Circuit case law shows that no Fifth Circuit panel reviewing a failure-to-hire Title VII discrimination case has adopted in a published opinion the standard Plaintiff now advocates.[13] Indeed, the cases Plaintiff cites for her standard are brought under the Age Discrimination Employment Act (ADEA). *See Smith,* 351 F.3d at 184–85; *Rachid,* 376 F.3d at 309. The Fifth Circuit has noted that the *McDonnell Douglas* standard for a prima facie case has been modified to fit the different statutory construction of the ADEA. *See Fields v. J.C. Penney Co., Inc.,* 968 F.2d 533, 536 n. 2 (5th Cir.1992). Moreover, in one of the cases Plaintiff cites, the Fifth Circuit noted that "it is inappropriate simply to transplant ... standards in their entirety into a different statutory scheme having a different history." *Smith,* 351 F.3d at 195 (quoting *Washington v. Davis,* 426 U.S. 229, 255, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (Stevens, J. concurring)). This Court is therefore wary to import standards based on different statutory frameworks involving dissimilar factual scenarios. *See also Gross,* 129 S.Ct. at 2349 (holding that the burden-shifting framework in Title VII mixed-mo-

tives cases does not apply to ADEA cases); *Holowecki,* 128 S.Ct. at 1153.

In addition, other circuit courts continue to apply the four-prong *McDonnell Douglas* formula outlined in *Joshi* in failure-to-hire cases, adding only that a party may also demonstrate the fourth prong of a prima facie case by showing that someone outside the protected class was hired. *See, e.g., Harrison v. United Auto Group,* 492 F.3d 972, 974 (8th Cir.2007) (adopting similar four-prong test to that found in *Joshi* and *McDonnell Douglas* ); *Rudin v. Lincoln Land Cmty. Col.,* 420 F.3d 712, 724 (7th Cir.2005) (same); *Sandoval v. City of Boulder, Colo.,* 388 F.3d 1312, 1321 (10th Cir.2004) (same); *Teneyck v. Omni Shoreham Hotel,* 365 F.3d 1139, 1149–50 (D.C.Cir.2004) (same) (stating that this formulation "remains the standard in typical failure-to-hire cases") (citations omitted); *E.E. O.C. v. Joe's Stone Crabs, Inc.,* 296 F.3d 1265, 1273 (11th Cir.2002) (same); *see also Longo v. Chao,* 536 F Supp.2d 729, 737 (W.D.Tex.2008) (citing *Thomas v. Trico Prods. Corp.,* 256 Fed.Appx. 658, 662 (5th Cir.2007) (unpublished)); *Davis v. Dallas Area Rapid Transit,* 383 F.3d 309, 317 (5th Cir.2004) (setting forth similar factors in analogous failure-to-promote case).

Nevertheless, there appears to be some support for interpreting the *McDonnell Douglas* framework to allow for recognition of a prima facie case if a plaintiff shows she was unlawfully discriminated against based on her protected status, even if another person within the protected class is hired in her place. As the Supreme Court in *McDonnell Douglas* recognized, "the facts necessarily will vary

---

**13.** The Fifth Circuit has also noted that the factor of "others similarly situated were treated more favorably" is appropriate for disparate treatment cases. *See Nasti,* 492 F.3d at 593 (citation omitted); *Crawford v. United*

*States Dep't of Homeland Sec.,* 245 Fed.Appx. 369, 378 (5th Cir.2007) (citing *McDonnell Douglas,* 411 U.S. 792 at 802, 93 S.Ct. 1817; *Septimus v. Univ. of Houston,* 399 F.3d 601, 609 (5th Cir.2005)).

in Title VII cases, and the specification above of the prima facie proof required from [plaintiff] is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. 1817. The *McDonnell Douglas* framework "was never intended to be rigid, mechanized, or ritualistic." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). "The central focus of the inquiry ... is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex or national origin." *Id.* (internal citations and quotations omitted).

Moreover, while not specifically adopting the standard in failure-to-hire Title VII cases, the Fifth Circuit has adopted certain aspects of Plaintiff's proposed standard in analogous cases. For example, in *McClaren v. Morrison Mgmt. Specialists, Inc.*, 420 F.3d 457 (5th Cir.2005) the Fifth Circuit used the *Rachid/Smith* standard in a failure-to-hire case under the Texas anti-discrimination statute. *McClaren*, 420 F.3d at 458. Once again, the decision was an ADEA case, but the Court noted in dicta that the application of the standard would be the same in a Title VII case. *See id.* at 462. The Fifth Circuit has elsewhere stated in dicta that the fourth prima facie element in a Title VII unlawful discharge case allows a plaintiff "to show that he was replaced by someone outside of the protected class or that he was otherwise discharged because of his race." *Fields*, 968 F.2d at 535 n. 2. The Fifth Circuit has also held in a Title VII unlawful discharge case that evidence that a defendant replaced a plaintiff with someone in the same protected characteristic is "not outcome determinative" and "that the single fact that a plaintiff is replaced by someone within the protected class does not negate the possibility that the discharge was motivated by discriminatory reasons." *Nieto v. L & H Packing Co.*, 108 F.3d 621, 624

(5th Cir.1997); *id.* at 624 n. 7 (quoting *Hornsby v. Conoco, Inc.*, 777 F.2d 243, 246–47 (5th Cir.1985) (additional citation omitted)). The Court agrees with the following language in the Third Circuit and analogizes it to the instant failure-to-hire case:

> The fact that a female plaintiff claiming gender discrimination was replaced by another woman might have some evidentiary force, and it would be prudent for a plaintiff in this situation to counter (or explain) such evidence. But this fact does not, as a matter of law or logic, foreclose the plaintiff from proving that the employer was motivated by her gender (or other protected characteristic) when it discharged her.
>
> ... In other words, even if a woman is fired and replaced by another woman, she may have been treated differently from similarly situated male employees. This seems to us to be self-evident. An employer may fire a woman who makes a single mistake (while retaining men who make numerous similar mistakes), yet replace her with another woman whom the employer hopes will meet his (higher) expectations for female employees. .... Or an employer may fire women who fail to act in a particular manner (e.g., "feminine," assertively, non-assertively), but not require male employees to act in any particular way. Such a requirement would be discriminatory, although an employer applying this double-standard would not necessarily hire a male employee to replace a fired female employee.

*Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir.1999) (unlawful discharge case); *see also id.* at 352 n. 6, (collecting cases from different circuits on the same issue).

■ Given the above-cited precedent and persuasive authority, the Court holds

that failure to prove that someone outside Plaintiff's protected class was hired in her place does not foreclose Plaintiff's prima facie case if she can otherwise demonstrate unlawful discrimination. As similarly stated in *Pivirotto*, Dr. Andrasik could have known that only a woman could be hired for a particular position, but nonetheless held women to a higher standard than the men he interviewed. Similarly, Dr. Andrasik could have expected Plaintiff to respond to certain questions in a certain gender-based way that he did not require of male employees.

■ There is evidence in the record for such conclusions. In her deposition, Plaintiff stated that during her evaluation, Dr. Andrasik asked her repeatedly about her ability to work in predominantly male environments. *See* Jimenez Dep. at 99:2–104:8. Plaintiff responded that being an El Paso police officer, she was used to such situations. *Id.* at 100:19–23. Dr. Andrasik then stated "I'm asking, because you're an attractive female; I'm not going to lie, you're a pretty lady ... And Dyncorp wants to know how you are going to handle yourself when these guys start hitting on you," allegedly referring to the forty-one male candidates with Plaintiff at the PAST program. *Id.* at 101:8–12. Plaintiff then repeated that she could handle male-dominated environments because that had been part of her job until then, to which Dr. Andrasik stated, "Well, you know it's going to be much different when you get to Afghanistan; I can only imagine the kinds of problems this is going to cause." *Id.* at 103:3–13. Dr. Andrasik also asked Plaintiff about her two children and asked specifically about the age of her oldest child. *Id.* at 106:2–4. When Plaintiff stated that her oldest was sixteen, he repeated the number back to her with what Plaintiff described as a surprised look on his face. *Id.* at 106:2–8. In the ensuing pause, Plaintiff stated that she had her first child when she was eighteen, to which Dr. An-

drasik stated, "Yes, but you weren't married." *Id.* at 106:10–13. Plaintiff stated this was true. *Id.* at 106:12–13. Dr. Andrasik later wrote in his notes that Plaintiff's first child was "Had out of wedlock." Andrasik Dep. Ex. 3.

Dr. Andrasik's alleged comments may ultimately be evidence of a psychologist seeking to determine whether a candidate can meet the specific rigors of an isolated one-year position halfway around the world. However, the gender-specific nature of these comments and the way in which certain comments were allegedly repeated and emphasized could also lead a trier of fact to determine that Dr. Andrasik inappropriately placed a greater emphasis on Plaintiff's gender than on her psychological suitability for the job.

In conclusion, the Court holds Plaintiff has presented enough evidence to make a prima facie showing that Plaintiff was unlawfully discriminated against based on her gender.

**E. Legitimate Nondiscriminatory Reason for Not Hiring Plaintiff**

■ Because Plaintiff has demonstrated a prima facie case for unlawful gender-based discrimination, the burden now shifts to Defendant to articulate a nondiscriminatory reason for why it did not hire Plaintiff. *See Nasti*, 492 F.3d at 593 (citing *Wallace*, 271 F.3d at 219). "The employer is not required to convince the Court that it was actually motivated by this reason; it need only raise a genuine issue of fact as to whether or not it discriminated against the plaintiff." *Id.* (citing *Tex. Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). In other words, the burden on the employer at this stage "is one of production, not persuasion; it can involve no credibility assessment." *Al-*

*varado,* 492 F.3d at 611 (additional citation and quotation omitted).

Defendant has stated that Plaintiff was not hired because she failed the psychological evaluation. *See* Pl.'s Ex. B ¶ 1 (Def.'s Answers and Objections to Plaintiff's First Set of Interrogatories). As the above-cited evidence has shown, this decision was based completely on the recommendation by the psychologists at Frontline, with Dr. Andrasik making the final recommendation after consultation with his colleagues. Also, as stated above, the decision not to recommend Plaintiff for the position was a subjective decision based on Dr. Andrasik's clinical judgment.

"An employer's subjective reason for not selecting a candidate, such as a subjective assessment of the candidate's performance in an interview, may serve as a legitimate, nondiscriminatory reason for the candidate's non-selection." *Alvarado,* 492 F.3d at 616 (citing *Patrick v. Ridge,* 394 F.3d 311, 317 (5th Cir.2004)). "Subjective reasons can be just as valid as objective reasons." *Chapman v. AI Transport,* 229 F.3d 1012, 1034 (11th Cir.2000). However, "[s]uch a reason will satisfy the employer's burden of production ... only if the employer articulates a clear and reasonably specific basis for its subjective assessment." *Alvarado,* 492 F.3d at 616 (citing, *Burdine,* 450 U.S. at 258, 101 S.Ct. 1089, *Chapman,* 229 F.3d at 1034). Evidence such as notes and comments on a candidate's interview performance, and other evidence which shows the decision is not "at least as consistent with discriminatory intent as it is with nondiscriminatory intent" may be produced to demonstrate the basis for the subjective assessment. *See id.* at 617 (quoting *Patrick,* 394 F.3d at 317).

In his follow-up report to Defendant regarding his recommendation not to hire Plaintiff, Dr. Andrasik noted several concerns that led him to ultimately give Plaintiff a failing grade. Specifically he stated the following: "Her general functioning is in the average range of intelligence. She may be challenged solving the more demanding problems she will face." Andrasik Dep. 87:4–6. "She's not particularly skilled at establishing appropriate friendships and emotional support." *Id.* at 91:2–3. "She tends to overestimate her assets and successes." *Id.* at 91:17–18. "She has very high expectations of herself which are difficult to meet." *Id.* at 92:8–9. "She is an impulsive individual who at times can have some difficulty controlling her emotions and her behaviors." *Id.* at 92:16–18. "She has limited self-awareness. She has a tendency to overlook important details." *Id.* at 94:21–23. "She does not make consistently objective decisions in her personal life. She has difficulty making good decisions in the absence of structure. She may promise more than she can deliver." *Id.* at 95:17–20. "She is not highly deferential and will resist too much control of bureaucracy." *Id.* at 96:11–12. "While she generally has no difficulties with authority, she prefers to set her own agenda. Being someone's friend may be too important to her and may interfere with supervisory responsibilities." *Id.* at 97:8–12. Dr. Andrasik was asked about each of these observations in his deposition and provided examples of comments Plaintiff made that led him to these conclusions. *See generally id.*

Without making a credibility assessment of Dr. Andrasik and these assertions, the Court holds that Defendant has "articulate[d] a clear and reasonably specific basis for its subjective assessment." *Alvarado,* 492 F.3d at 616. Accordingly, Defendant has met its burden of production and produced a legitimate nondiscriminatory reason for not hiring Plaintiff.

**F.  Pretext**

With Defendant's articulation of a nondiscriminatory reason not hiring Plain-

tiff, the burden shifts one final time to Plaintiff, who must produce "substantial evidence" that the employer's proffered reasons for its actions were a pretext for discrimination. *Nasti*, 492 F.3d at 593 (citing *Wallace*, 271 F.3d at 220); *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 402 (5th Cir.2001). A plaintiff can establish pretext "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Id.* (internal quotations and citations omitted). A plaintiff may also show that the employer's reason, while true, is not the only reason for its conduct, and another "motivating factor" is the plaintiff's protected characteristic, thus presenting a "mixed-motive" case. *Alvarado*, 492 F.3d at 611 (citation omitted); *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir.2005); 42 U.S.C. § 2000e–2(m) (providing that "an unlawful employment practice is established when the complaining party demonstrates that [a prohibited characteristic] was a motivating factor for any employment practice, even though other factors also motivated the practice").

Plaintiff has failed to present evidence demonstrating that Dr. Andrasik's reasons for giving her a failing score are "false or unworthy of credence." *Nasti*, 492 F.3d at 593. As stated above, Dr. Andrasik gave detailed and articulate reasons for his decision not to give Plaintiff a passing score, and he specifically tied those reasons to comments Plaintiff made during her evaluation. Dr. Andrasik added that he had concerns about Plaintiff's "impulsivity" and the manner in which Plaintiff handled the end of both of her marriages, specifically, that "she up and left in both cases without trying to resolve it, without trying to address it." Andrasik Dep. 60:1–4; 70:23–71:5. Dr. Andrasik also expressed concern that in every case that she was reprimanded by the El Paso Police Department, "it was someone else's fault, [she did not]

accept[ ] any responsibility for [her mistakes], and just the more casual way in which she was talking about them." *Id.* at 76:8–12. Dr. Andrasik also stated that he "had a hard time getting a straight story out of" Plaintiff concerning a particular reprimand from the Police Department that was upheld against her. *Id.* at 77:20–21. He also expressed concern that Plaintiff had a disproportionate number of missed and late court dates and false arrests. *Id.* at 78:9–16. Finally, Dr. Andrasik noted that Plaintiff did not have a lot of supervisory experience. *Id.* at 84:7–13.

Plaintiff has not disputed any of these conclusions. Moreover, Plaintiff has presented no evidence that the facts they are based on are false. Plaintiff argues that Dr. Andrasik's failure to mark anything in the "Red Flags" section of his notes demonstrates his reasons are unworthy of credence. Plaintiff's Response 14. However, the copious remaining notes provide ample evidence from which Dr. Andrasik could make his nondiscriminatory conclusions. Moreover, as the evidence demonstrates, any discriminatory hiring decision came after the interview and after consultation with his colleagues. The absence of "Red Flags" being marked during the interview is therefore not probative of impressions he made later when discussing Plaintiff with Frontline.

Plaintiff has also failed to show disparate treatment. To show disparate treatment, Plaintiff must demonstrate that those outside of her protected group were treated more favorably in "essentially identical" circumstances. *See, e.g., Wallace*, 271 F.3d at 221 (quoting *Barnes v. Yellow Freight Sys., Inc.*, 778 F.2d 1096, 1101 (5th Cir.1985)). Plaintiff has failed to produce any evidence that the questions she was asked in her interview were different from the questions asked of the male employees. Even if Plaintiff did show the

questions she was asked were substantively different from that of her male colleagues, Plaintiff has also failed to show that the male candidates were going to similar jobs or were otherwise similarly situated, thus making the questions asked of them all the more irrelevant.

Plaintiff has presented some statistics which she argues "bolsters a finding of discrimination," showing that Defendant hired men in greater numbers and at slightly higher percentages. Pl.'s Resp. 14–15. However, Plaintiff has failed to present these statistics in any context from which the Court can make meaningful conclusions. Among their other failings, Plaintiff fails to indicate what types of jobs are being tracked, what the job qualifications are, and where they are located. *See Carter v. Ball*, 33 F.3d 450, 456 (4th Cir. 1994) (noting that "the usefulness of statistics depends on the surrounding facts and circumstances" and discounting "evidence with little or no probative value") (citations omitted).

The question remains whether improper consideration of Plaintiff's gender was a "motivating factor" and Dr. Andrasik had mixed motives in his final decision. *See Alvarado*, 492 F.3d at 611; *Keelan*, 407 F.3d at 341. Plaintiff's argues that Dr. Andrasik's questions about her age and marital status when she had her first child are evidence of unlawful discrimination as motivating factors, as were Dr. Andrasik's purported reaction to her responses. Pl.'s Resp. 13. Plaintiff states that Dr. Andrasik allegedly registered surprise and disapproval at Plaintiff having a child "out of wedlock" when she was eighteen, and he further stated, "Yes, but you weren't married." Plaintiff's other evidence of discrimination is Dr. Andrasik's repeated comments about how good she looked, his purported "cocky attitude" when asking questions about her ability to handle men hitting on her, the frequency of Dr. Andra-

sik's questioning about her ability to handle men "hitting on her" at the PAST program, and his comment that her good looks would cause her problems in Afghanistan. *See id.* at 101:2–103:13.

As stated in the section dealing with prima facie evidence, Dr. Andrasik's alleged remarks may have simply been intended to elicit probative responses that would demonstrate Plaintiff's psychological suitability for a job in a unique environment. However, the nature of the alleged comments may also lead a trier of fact to conclude that Dr. Andrasik regarded Plaintiff's status as a woman as requiring a heightened degree of competency than that of a man under similar circumstances. The Court concludes the evidence is sufficient to allow a trier of fact decide this issue.

Given Dr. Andrasik's alleged emphasis on Plaintiff's appearance, his repeated focus on her ability to handle the sexual advances of the opposite sex, his comments that her appearance would cause further problems at her duty station, and his purportedly contemptuous attitude towards Plaintiff having her first child at such a young age and "out of wedlock," the Court finds Plaintiff has produced substantial evidence that Defendant's nondiscriminatory reasons for not hiring her are pretext for unlawful discriminatory behavior based on Plaintiff's gender.

## III. CONCLUSION

The Court holds that when making a determination as to whether Plaintiff was psychologically suitable for the job Plaintiff applied for, Dr. Andrasik and the psychologists at Frontline acted as agents for Defendant in the context of Title VII. The Court further holds that Plaintiff has presented a prima facie case of gender discrimination. While Defendant has presented evidence of legitimate nondiscrimi-

612

natory reasons for not hiring Plaintiff, Plaintiff has presented sufficient evidence that Dr. Andrasik's alleged gender bias was nonetheless a motivating factor in Plaintiff not being hired for the position.

Accordingly, Defendant's Motion for Summary Judgment (**Doc. No. 27**) is **DENIED.**

**SO ORDERED.**